So we will hear the day calendar, and the first case is Cassette v. Sessions. I see counsel here. Good morning. May it please the court, I represent the petitioners in this case. This is an appeal of a final order of removal issued by the Board of Immigration Appeals challenging a decision denying the petitioner's claim for cancellation of removal. And the one legal issue that the board denied the petitioner's appeal was based on whether they had adequately proved 10 years of continuous physical presence as required by the statute. From the petitioner's point of view, the government's concession a few days ago in a letter that petitioner Cassette did provide adequate evidence that she entered the U.S. 10 years before. Her notice to appear as issued is sufficient for the court to grant the petition and remand Cassette's appeal because that was Why is that alone sufficient? Because in order to show the 10 years, it's not necessary only to show that she entered more than 10 years before the notice to appear, but that she did not absent herself from the United States for more than 90 days at one time or 180 days in the aggregate. Sure. Well, I think the way that the BIA decided the case is they didn't see it as two separate legal issues as to whether you met one and the other. They saw it as one legal issue of 10 years of physical presence because reviewing the decision, it doesn't say that petitioner Cassette failed to prove her initial entry date. And in the alternative, she also didn't prove the 180 days. All they say is we don't think that her evidence is enough on the entry date. We also don't think her evidence is enough on the absences. There are two requirements and they thought she didn't meet either of them. The government has conceded on the first, but I'm still of the same mind as Judge Jacobs. How is it that the second doesn't remain a fatal problem for her? Well, I guess if the court disagrees with my point of view on that, then our position would be that essentially what the board did not make a negative credibility finding. They just said we think your testimony, which is not corroborated, is not enough to meet your burden of proof. And I think what the petitioner's point of view is, once the government is conceding that one major part of the testimony was corroborated, that a fact finder might say, well, when your whole testimony is uncorroborated, we're not willing to give you the benefit of the doubt and say your testimony standing alone is enough to meet your burden of proof. You're saying that credibility is a ball of wax and everything is an input and if the IJ didn't believe that she entered 10 years before the NTA, that would have bearing on the credibility question as to whether she absented herself for more than 90 days or 180 days in the aggregate. Yes, essentially that if the IJ was aware that there was a piece of evidence corroborating the initial entry. What was it? I mean, she claimed that she lost her passport. Yes. How did she prove that, what was her documentation? How could she go about carrying her, sustaining her burden? Well, I think she could sustain her burden with her testimony because her testimony is evidence. And despite the fact that she wasn't able to remember the specific number of days of each trip. Well, she couldn't remember and that's accurate. Yes. She could not remember. Sure. If she couldn't remember, then how could she sustain her burden? Well, I think looking at that in terms of the way that sort of normal people discuss trips. I think if you pick someone off the street and said, let's talk about a trip that you made 15 years ago. Do you remember the number of specific days the trip was? No. Well, she did say that on one of the trips, I think the longest of the three trips, it was no more than two months, right? Yes. I don't know whether she was tailoring it around the 90 days or not, but I'm just curious. This is more a government question, I guess, is I had a hard time adding up the 180 days. I mean, she said I didn't leave for more than 180 days. Was there any calculation by the immigration judge of, well, the first trip it was two weeks, second trip two months, third trip another month and a half? I mean, I didn't see any of that in her testimony. I'm not aware of any specific – that level of specificity is not in the testimony. But I think what the petitioner did testify is I do know I made these trips, but I can say that it was less than these amounts. And I think that comports with the normal way people talk about things. I mean, if you're discussing a trip that you made 20 years ago and your passport's lost, a normal person would say, look, I can't remember if it was 9 days, 10 days, but I can say it was less than a month. So I think that's a pretty normal way for a witness or a person to talk about a trip. That is a normal way to talk about vacations that we took 10 or 15 years ago. Yes. But when we talk about these things, we're not usually trying to sustain a burden of proof as to an issue critical. Yes. And I think that gets into what – another thing that the board missed is the petitioner presented evidence that long before she was applying for cancellation of removal, she had testified under oath in both police reports and an application for a protection order that she had lost her passport, which I think corroborates the fact that she lost her passport. It's not just she conveniently lost it right before she applied for cancellation of removal, that long before she was in removal, long before she was even potentially eligible for this form of relief, she had been testifying under oath to government officers, I lost my passport. Can I ask you about Mr. Kamara too? Yes. The biggest problem it seems for him is this visa application issue. And was it possible in 2002 to apply for it online and do the interview from a distant location? The government seems to say that that's only possible after 2008. Does he concede that and just say, well, it was someone else, someone was using my photograph and maybe it was my brother? I certainly hadn't researched it before the government pointed it out, and I wasn't able to find anything specifically saying that you were able to apply online, so I can't say for sure whether you could or not. What I can say for sure is that the regulation cited by the government discussing visa interviews before this change to digital allowed for the waiver of the physical presence of the person at the interview, and the printout that they provided from the State Department in the part that says fingerprints specifically uses the word waived, which I think is evidence that the interview was waived, because it says it right in the State Department's printout that was provided by the government as impeachment evidence against Petitioner Kamara trying to say that he was present at the interview. Could you do it online or did you have to be there? I guess I can't 100% say for sure I'd have to. I mean, I know even before they were digital they were mailed in, because I did a few before then, so they could have mailed it in, but I can't say for sure whether it was a digital back then or not. But basically what the petitioners, what they're arguing on that point is the regulation cited by the government says the interview can be waived. The piece of evidence the government's presenting to say that the Petitioner Kamara was there uses the word waived when it comes to what you would do in person at the interview, the fingerprints. So I'm not really sure how that's consistent, how that's inconsistent with his testimony that he wasn't present at the interview. She lost her passport. As I recall, the question is whether her ex-husband. Abusive ex-husband essentially took it and refused to give it back to her. How come she had a photocopy of it? Well, I think she had had a photocopy of just two pages of it, just I guess sort of luck in her records that she was able to find the face page and the first date of the entry page. Ordinarily, nobody has photocopies of documents for which photocopies are not valid. Well, I mean, as stated in the police report and the protection order records, the petitioner cassette essentially had to flee from her husband. So I think it would certainly make sense when you're just sort of grabbing your belongings and fleeing from your abusive husband, you might just grab a few, you know, you might just grab whatever's there. And if it's only a few pages, it's only a few pages and it's not everything. You know, a lot of these arguments might indeed persuade, but the issue before us is whether they have to, isn't it? I mean, we have to find that the agency could not reasonably reject the claim, and that seems to be a harder conclusion to reach. I think we only get to that if the agency reviewed the evidence itself, because failure to review relevant evidence is a legal error that requires the agency to look at it, and the first time in the government is itself conceding that at least one part of it they didn't look at. And from our point of view, the evidence of the police reports and the protection order corroborating her lack of corroboration, they also didn't review. And essentially, once the fact finder sees that there is a piece of evidence corroborating the testimony on the entry date, they might step back and say, well, now that this is corroborated, we're going to look at all of your testimony a little differently, and a reasonable fact finder could give her the benefit of the doubt on the other issue, especially when she has an adequate explanation as to why she can't corroborate that part of it. So I think there is a more than reasonable chance that the agency could reverse itself once it sees that there is evidence to corroborate the entry date. You've reserved rebuttal. Yes, I did. Thank you, Your Honor. Good morning. Good morning. May it please the Court. Stephen Uegio appearing on behalf of the Attorney General. This Court should deny the petition because the agency reasonably decided that Miss Cassette and Mr. Camara failed to establish 10 years' continuous physical presence in the United States prior to service of their notices to appear. With respect to Miss Cassette, she initially testified that she departed the United States only twice during the relevant period. Do you concede the 10 years for her, though? In terms of when she first arrived? Yes, Your Honor. So it's just her departures? Yes, in terms of the continuity of her presence in the United States. She initially testified that she departed the United States only twice during the relevant period, once in 1999 and again in 2001. With respect to her departure in 1999, she did not identify the specific date that she departed or she reentered the United States, and she acknowledged that she had no evidence of those dates. With respect to her departure in 2001, she also did not testify regarding the specific date that she departed or she reentered, and she acknowledged that she didn't remember the date that she departed and that she had no evidence. Did she give parameters? Yes, Your Honor. With respect to... And if you take the furthest reach of those parameters, do you get to 90 days on any given trip or to 100 days? It's possible on the second, Your Honor, because she testified that she departed around March of 2001 and that she returned around June. There are 122 days between beginning of March and the end of June in 2001. So it's possible for 2001 that it exceeded 90 days, Your Honor. I thought she said it could have been more than 60, but it wasn't 90. That is true, Your Honor. Did she testify to that? Yes, she did testify to that, but she also testified that she left around March and she left around June, so there's some inconsistency in that testimony itself, Your Honor. And finally, although Ms. Cassett... Let me follow up on Judge Jacobs then. Okay, so that's the 90-day problem. What about the 180 days? I've read her testimony, and I couldn't figure out how the government arrived at 180 days. I know it's her burden, but if she comes in and said, I never left for more than 180 days total, and then she gets cross-examined about these trips, how do we say, well, then, she hasn't met her burden? If the government said, well, here's the three trips, they equal 182 days or something like that. Was there anything like that in there? There are two points. First, as you noted, it is her burden to establish that she did not depart for any single departure for 90 days or 180 days in the aggregate, and there was no mathematical computation that the agency did in this case specifically identifying, and I think that's in large part because she wasn't specific in terms of her departures. She estimated that the first departure was maybe 15 days or two weeks. The second departure, again, was sometime between March and June of 2001, and when on cross-examination it was revealed that she had, in fact, departed on a third occasion in the year 2000, she was asked to explain why didn't she include this additional departure on direct examination, and she said, I don't remember the date. So with respect to that third departure, we simply don't know the date. So it is possible, depending on how long that middle trip was, that it could reach 180 days. That does equal 180 days. Well, we don't know the duration of the third trip in 2000, which could be as much as 90 days, I believe, or somewhere in that range. The first trip, assuming that she was accurate... 90 days? What about 60 days? That was her testimony. For the 2001 trip, but for the 2000 trip that was revealed on cross-examination, she said, I don't remember the dates of that trip. So there's kind of no beginning and ending point for that middle trip. Does the government not have records as to when people leave and when they come back? Not necessarily, Your Honor, because although they may have records... It may be her burden, but if you guys have the records, then you may have an obligation, in all fairness, to... And there are, very early on in the proceedings in this case, Your Honor, I think it was beginning on the individual hearing on September 9, 2009, the immigration judge specifically identified that your continued physical presence is going to be an issue in this case. And there is a method by which aliens can obtain their travel documentation from the Department of Homeland Security. It's online. You just submit an online request, and they can give you information for the last five years. If you want any information beyond that, then you submit a FOIA request, and you can collect that information, Your Honor. So to the extent that petitioners thought that... But the government has all this. I can't say exactly what information they have. You're saying if you submit a FOIA request, you can... Yes, that you can get... But, again, like in this case, at least for Mr. Kamara, he testified that he initially entered on some passport from which he doesn't know how he obtained... His brother's. It was his brother's, I believe. ...for his departure, but he doesn't know for his initial entry. Oh, I thought he entered on his brother's passport. No, he testified that he came in on someone else's passport, that he doesn't know how he got it or where it went. He testified that he left and returned on his brother's passport. So even in that circumstance... He wouldn't have any records one way or the other. That's correct, Your Honor. About him, can you tell me about this online application process? Was it possible in 2002 to do it online without being outside the United States? It is my understanding that it could not be done online. At that point, you didn't have to be in person. As a general matter, you would submit an application in person, but you could also do it by mail or by courier. But the State Department had also issued guidance to its counselor offices the year before that nonimmigrant visa applications should not be denied for substantive reasons, which was done here, a 214B reason, without having an interview in person, Your Honor. The simple question is, in 2002, could he have submitted his application for a visa without going to the Ivory Coast to do it? It could have been submitted by mail, but it could not have been denied without an in-person interview, Your Honor. And it was denied? Yes, Your Honor. And the in-person interview, so this issue about waiving that's on the fingerprint stamp, so that's a red herring? Is that right? And so my own... Why would they do that? Why would they waive the in-person fingerprints if they had to interview him? So my understanding would be that perhaps, this is just speculation on my part, Your Honor, I admit, but perhaps that they made a determination that Mr. Kumar failed to establish that he was coming in as a nonimmigrant. They said, we're going to deny this, therefore we're going to waive any fingerprinting because maybe that would be a subsequent step if they determined that, oh, you should be allowed to enter on a nonimmigrant visa, okay, now we're going to fingerprint you as the next step to make sure that there's nothing wrong with your application. So they denied it before they saw the need for fingerprints? That's as far as... But that's just speculation. Yes, Your Honor. But again, with respect to his departure from the United States, he testified that he returned to the United States on June 15, 2004, but he did not offer any testimony regarding the specific date that he had departed the United States. If the Court has no further questions, the government rests on the arguments set forth in its brief. Thank you. We'll hear rebuttal. Thank you. For the issues of Mr. Kamara, I know one of the issues that the BIA had said was that he had failed to adequately corroborate the initial entry in the first 10 years. And I know that he had presented, which is in the record, postmarked letters that were sent to him before the... It doesn't show the specific date that he entered, but it's dated before the 10 years on the notice to appear. And neither the immigration judge nor the Board of Immigration Appeals said that that evidence was inadequate, was incredible, was somehow fabricated. So I think when he provides the corroboration, if they're going to demand more corroboration, they need to explain why what he gave wasn't enough. And I think when you're talking about someone who's in the country without US citizenship, without a green card, without a Social Security card, 10 years or 15 years before they're in court, I think it's pretty reasonable to say that a person isn't going to be able to have a phone book of credit cards and utility bills and the kinds of things that a US citizen would have, and that that, you know, sort of absent an explanation as to why that evidence is incredible or implausible, it should be enough to meet his burden of proof, at least on that issue. Thank you. Thank you. Thank you both. What was their decision?